## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

YOUNG AMERICA'S FOUNDATION,

  *Plaintiff*,

v.

REBECCA CUNNINGHAM, in her official capacity as President of the University of Minnesota; DOUGLAS A. HUEBSCH, RUTH E. JOHNSON, PENNY A. WHEELER, JOEL E. BERGSTROM, JAMES T. FARNSWORTH, ELLEN G. LUGER, ROBYN J. GULLEY, SAMUEL D. HEINS, TADD M. JOHNSON, KOWSAR D. MOHAMED, MARY C. TURNER, and KODI J. VERHALEN in their official capacities as members of the Board of Regents; MERCEDES RAMIREZ FERNANDEZ, in her official capacity as Vice President, Office for Equity and Diversity; CALVIN D. PHILLIPS, in his official capacity as Vice President for Student Affairs at the University of Minnesota-Twin Cities; TINA MARISAM, in her official capacity as the Associate Vice President, Office of Equity and Diversity, Director of Title IX & ADA Coordinator for the University, and Director of the Equal Opportunity & Title IX Office for the University of Minnesota-Twin Cities; COREY CHRISTENSEN, in his official capacity as Equal Opportunity Associate and Title IX Coordinator at the University of Minnesota-Duluth; LAUREN ADAMSKI, in her official capacity as Director of the Office for Community Standards at the University of Minnesota-Twin Cities; and CHRIS KABERLINE, in her official capacity as Director of the Office of Student Conduct and Conflict Resolution at the University of Minnesota-Duluth,

  *Defendants*.

) No. _____

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

---

**INTRODUCTION**

1.      The University of Minnesota System (the University) has "cast a pall of orthodoxy" over its students, classrooms, and campuses. *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967). Portions of several University-wide policies forbid students and guests from speaking on one side of the debate about gender identity and transgender issues and also forbid them from using biological pronouns and other gendered personal references to refer to individuals identifying as transgender, genderfluid, or non-binary. The University attempts to justify these speech codes by claiming that this speech offends its hearers. But the First Amendment does not allow universities, of all places, to restrict student speech just because others disagree with or dislike it.

2.      The University is far from alone in creating speech restrictions like these policies. Students' right to speak traditional views based in biology about gender identity and transgender issues in the classroom and on campus is under attack at colleges and K-12 schools across the country.

3.      In 2024, at the national level, the Department of Education under the Biden administration unsuccessfully attempted to redefine "sex" under Title IX to include gender identity, prohibit students from voicing opinions protecting women's sports and women's private spaces in schools, and force students to use "preferred" pronouns instead of biological pronouns to refer to individuals identifying as transgender, genderfluid, or non-binary. Courts across the country, relying in part on the First Amendment, quickly halted these efforts, eventually vacating the unlawful and unconstitutional Final Rule. *See Arkansas v. U.S. Dep't of Educ.*, 742 F. Supp. 3d 919, 945 (E.D. Mo. 2024) (relying in part

on First Amendment to preliminarily enjoin Final Rule entitled Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33,474 (Apr. 29, 2024) ("Final Rule")); *see also Tennessee v. Cardona*, 762 F. Supp. 3d 615, 624–25 (E.D. Ky. 2025) (relying in part on First Amendment to permanently enjoin Final Rule); *Kansas v. U.S. Dep't of Educ.*, 739 F. Supp. 3d 902, 926–28 (D. Kan. 2024) (relying in part on First Amendment to preliminarily enjoin Final Rule).

4.      K-12 public school districts have also unsuccessfully attempted to limit speech on gender identity and transgender issues while compelling "preferred" pronoun usage and punishing "misgendering." Courts, including the Eighth Circuit, have enjoined these policies. *See, e.g.*, *Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658 (8th Cir. 2023) (enjoining school district's policy prohibiting refusal to respect a student's gender identity); *see also Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 158 F.4th 732 (6th Cir. 2025) (en banc) (*Olentangy*) (ordering entry of preliminary injunction of school district's policy requiring "preferred" pronouns).

5.      The University's unconstitutional restrictions at issue in this case arise from how the University defines what it calls "hostile environment sexual harassment" and "discriminatory harassment" and from a policy that requires "preferred" pronoun usage by students and guests. The policies hosting these challenged provisions are:

> (a) Board of Regents Sexual Harassment, Sexual Assault, Stalking and Relationship Violence Policy (Board of Regents Sexual Harassment Policy)[1];

---

[1] The Board of Regents Sexual Harassment Policy is attached as Exhibit A to this Complaint and is also available at: https://perma.cc/7NE8-53HT.

(b) The University's Administrative Policy entitled "Sexual Harassment, Sexual Assault, Stalking and Relationship Violence" (Administrative Sexual Harassment Policy)[2];

(c) The University's Administrative Policy entitled "Equity and Access: Gender Identity, Gender Expression, Names and Pronouns" (Pronoun Policy)[3]; and

(d) The University's Administrative Policy entitled "Discrimination" (Discrimination Policy).[4]

The University's speech codes are enforced through the above-named policies and the Board of Regents Student Conduct Code.[5]

6. Because of these policies, students, including student members of Plaintiff Young America's Foundation (YAF), are chilled from expressing their opinions on gender identity and transgender issues both on and off campus.

7. Because of these policies, students fear speaking broadly supported ideas like "men should not compete in women's sports or use their bathrooms," "there are only two genders," "sex is immutable," "a man cannot get pregnant," or "a man cannot become a woman, and a woman cannot become a man." They fear speaking because they might be reported and subject to discipline.

---

[2] The Administrative Sexual Harassment Policy is attached as Exhibit B to this Complaint and is also available at: https://perma.cc/QU3Y-6ACK.

[3] The Pronoun Policy is attached as Exhibit C to this Complaint and is also available at: https://perma.cc/J4E7-L7DP.

[4] The Discrimination Policy is attached as Exhibit E to this Complaint and is also available at: https://perma.cc/6PYH-BFJY.

[5] The Student Conduct Code is attached as Exhibit F to this Complaint and is also available at: https://perma.cc/5QHY-NPG6.

8.   These students are also afraid to bring speakers who agree with them to campus, including speakers associated with YAF, because they might say the same things, resulting in the student-host's prosecution for his guest's speech.

9.   These students are likewise afraid to use biological pronouns to refer to persons identifying as transgender, genderfluid, or non-binary, again for fear of being investigated and being subject to disciplinary action. The students are compelled—against their beliefs—to use "preferred" pronouns and other gendered personal references as part of their everyday interactions with other students and with professors, as well as in particular classes like foreign language courses.

10.   Through the policies, the University has silenced debate on these important issues of public concern instead of cultivating debate.

11.   Plaintiff YAF therefore challenges these unconstitutional policies in this action. YAF seeks a declaration that the University's definition of "hostile environment sexual harassment" and "discriminatory harassment" and the University's policy requiring the use of "preferred" pronouns and other gendered personal references by students and guests facially violate the First Amendment. Plaintiff YAF also seeks an order permanently enjoining these aspects of the policies.

## JURISDICTION & VENUE

12.   This action arises under the First and Fourteenth Amendments to the United States Constitution and is brought under 42 U.S.C. §§ 1983 and 1988.

13.   This Court has federal question jurisdiction over this case under 28 U.S.C. §§ 1331 and 1343 because this action concerns whether the challenged portions

of the policies adopted by Defendants for the University, and Defendants' enforcement thereof, violate the First and Fourteenth Amendments to the United States Constitution.

14. Venue is proper in this Court under 28 U.S.C. § 1391. A substantial part of the events giving rise to the claims occurred in this district. Further, Defendants, sued only in their official capacities, reside in this district.

15. This Court has personal jurisdiction over all Defendants. Defendants, as University officials sued only in their official capacities, reside in and maintain a continuous and systematic presence in this district.

**PARTIES**

16. Plaintiff Young America's Foundation is a 501(c)(3) nonprofit organization with members on college campuses across the country, including in Minnesota. YAF's mission is to ensure that young Americans are inspired by the ideas of individual freedom, a strong national defense, free enterprise, and traditional values. Consistent with its mission, YAF provides college students with access to educational resources, campus flyers, and tabling materials. YAF also provides college students with access to speakers, including speakers about gender identity and transgender issues, such as Chloe Cole who speaks about her experience detransitioning. Within the University, members of YAF are currently enrolled at the University of Minnesota-Duluth, the University of Minnesota-Morris, the University of Minnesota-Rochester, and the University of Minnesota-Twin Cities.

17. Defendant Rebecca Cunningham is President of the University. The Board of Regents' Sexual Harassment Policy vests authority with Defendant Cunningham to

address complaints of behavior by students that violate this policy. The Board of Regents' Diversity, Equity, Inclusion, and Equal Opportunity Policy vests authority with Defendant Cunningham to monitor and remedy discriminatory practices. The Board of Regents' Student Conduct Code vests authority with Defendant Cunningham to implement the Student Conduct Code and establish procedures governing alleged violations of the Student Conduct Code. Defendant Cunningham is therefore responsible, at least in part, for the enforcement of the challenged policies. Defendant Cunningham is sued in her official capacity.

18.     Defendant Douglas A. Huebsch is the chairman of the Board of Regents. Defendants Ruth E. Johnson and Penny A. Wheeler are vice chairwomen of the Board of Regents. Defendants Joel E. Bergstrom, James T. Farnsworth, Ellen G. Luger, Robyn J. Gulley, Samuel D. Heins, Tadd M. Johnson, Kowsar D. Mohamed, Mary C. Turner, and Kodi J. Verhalen are members of the Board of Regents. These defendants are sued in their official capacities.

19.     Defendant Mercedes Ramirez Fernandez is the Vice President, Office for Equity and Diversity. The Administrative Sexual Harassment Policy, the Pronoun Policy, and the Discrimination Policy each list Defendant Fernandez as the "Responsible Officer." Defendant Fernandez is therefore responsible, at least in part, for the enforcement of the challenged policies. Defendant Fernandez is sued in her official capacity.

20.     Defendant Calvin D. Phillips is the Chief Student Affairs Officer for the University. He is also the Vice President for Student Affairs at the University of Minnesota-Twin Cities. The Administrative Policy entitled Resolving Alleged Student Conduct Code

6

Violations lists Defendant Phillips as the "Responsible Officer." Defendant Phillips is therefore responsible, at least in part, for the enforcement of the challenged policies. Defendant Phillips is sued in his official capacity.

21.    Defendant Tina Marisam is the (a) Associate Vice President, Office of Equity and Diversity; (b) Director of Title IX & ADA Coordinator for the University; and (c) Director of the Equal Opportunity & Title IX Office for the University of Minnesota-Twin Cities. The Administrative Sexual Harassment Policy, the Pronoun Policy, and the Discrimination Policy each list Defendant Marisam as the "Primary Contact." Further, Defendant Marisam is the head of the office for both the University and the University of Minnesota-Twin Cities tasked with receiving formal and anonymous complaints alleging violations of the Administrative Sexual Harassment Policy and for implementing informal problem-solving processes to resolve informal complaints under the Administrative Sexual Harassment Policy. Additionally, Defendant Marisam is the head of the office at the University of Minnesota-Twin Cities to which individuals may direct complaints alleging violations of the Pronoun Policy. Finally, Defendant Marisam is the head of the office at the University of Minnesota-Twin Cities that the Discrimination Policy tasks with engaging in informal problem-solving processes and conducting investigations. Defendant Marisam is therefore responsible, at least in part, for the enforcement of the challenged policies. Defendant Marisam is sued in her official capacity.

22.    Defendant Corey Christensen is an Equal Opportunity Associate and the Title IX Coordinator at the University of Minnesota-Duluth. Defendant Christensen is the head of the office at the University of Minnesota-Duluth tasked with receiving formal and

anonymous complaints alleging violations of the Administrative Sexual Harassment Policy. Further, the Administrative Sexual Harassment Policy tasks Defendant Christensen with implementing informal problem-solving processes at the University of Minnesota-Duluth. Defendant Christensen is also the head of the office at the University of Minnesota-Duluth to which individuals may direct complaints alleging violations of the Pronoun Policy. Finally, Defendant Christensen is the head of the office at the University of Minnesota-Duluth that the Discrimination Policy tasks with engaging in informal problem-solving processes and conducting investigations. Defendant Christensen is therefore responsible, at least in part, for the enforcement of the challenged policies. Defendant Christensen is sued in his official capacity.

23. Defendant Lauren Adamski is the Director of the Office for Community Standards at the University of Minnesota-Twin Cities. She is the head of the office tasked with responding to and resolving allegations of prohibited conduct by students under the Discrimination Policy. The administrative policy entitled Resolving Alleged Student Conduct Code Violations also lists Defendant Adamski as the University of Minnesota-Twin Cities campus contact. Defendant Adamski is therefore responsible, at least in part, for the enforcement of the challenged policies. Defendant Adamski is sued in her official capacity.

24. Defendant Chris Kaberline is the Director of the Office of Student Conduct and Conflict Resolution at the University of Minnesota-Duluth. She is the head of the office tasked with responding to and resolving allegations of prohibited conduct by students under the Discrimination Policy. The administrative policy entitled Resolving Alleged Student

Conduct Code Violations lists Defendant Kaberline as the University of Minnesota-Duluth campus contact. Defendant Kaberline is therefore responsible, at least in part, for the enforcement of the challenged policies. Defendant Kaberline is sued in her official capacity.

## FACTUAL ALLEGATIONS

### Board of Regents and the University of Minnesota System Policies

25.     A series of policies adopted by the Board of Regents and the University chill and infringe the right of students and guests to freely speak on gender identity and transgender issues and to use biological pronouns and other gendered personal references to refer to individuals who identify as transgender, genderfluid, or non-binary.

### Board of Regents Policy:
### Sexual Harassment, Sexual Assault, Stalking and Relationship Violence

26.     The Board of Regents adopted a Sexual Harassment, Sexual Assault, Stalking and Relationship Violence Policy (Board of Regents Sexual Harassment Policy) on October 13, 2017. The Board of Regents last amended this policy on July 30, 2020.

27.     The Board of Regents Sexual Harassment Policy prohibits "hostile environment sexual harassment." It defines "[h]ostile environment sexual harassment" to include "unwelcome conduct on the basis of sex" that "is severe, persistent or pervasive" and either (a) "unreasonably interferes with an individual's employment or educational performance" or (b) "creates a work or educational environment that an individual finds, and a reasonable person would find, to be intimidating, hostile or offensive."

28.     The Board of Regents Sexual Harassment Policy does not define "sex."

9

29.     On information and belief, the definition of "sex" in the Administrative Sexual Harassment Policy, discussed *infra* at Paragraphs 49–85, applies to the same term in the Board of Regents Sexual Harassment Policy, and it encompasses gender identity and gender expression.

30.     Because the Administrative Sexual Harassment Policy defines sex to include gender identity and gender expression and the Board of Regents Sexual Harassment Policy prohibits protected speech about gender identity or transgender issues that might offend or feel hostile to a hearer, or merely "unreasonably interfere[] with . . . employment or educational performance," the Board of Regents Sexual Harassment Policy is unconstitutional.

31.     The Board of Regents Sexual Harassment Policy applies across all University campuses.

32.     The Board of Regents Sexual Harassment Policy applies to both members and guests of the University community.

33.     The Board of Regents Sexual Harassment Policy defines "University member" as "any . . . University student . . . or . . . third party who is engaged in any University activity or program, or who is otherwise interacting with the University, including, but not limited to . . . guests."

34.     Because the Board of Regents Sexual Harassment Policy applies to "guests," it applies to individuals whom students invite onto campus to speak to the University community.

10

35. The Board of Regents Sexual Harassment Policy states that "[t]he University shall . . . prohibit members of the University community from engaging in, or assisting or abetting another's engagement in, prohibited conduct."

36. The Board of Regents Student Conduct Code, discussed at greater length *infra* at Paragraphs 155–167, defines "assists or abets" as when a student "(a) helps any other person engage in prohibited behaviors as defined by the *Student Conduct Code*; and (b) intends the prohibited behavior to occur or knows that their actions are significantly likely to help the other person to engage in the prohibited behavior."

37. On information and belief, this definition applies to the Board of Regents Sexual Harassment Policy.

38. As a result of the "assisting or abetting" provision in the Board of Regents Sexual Harassment Policy, if a University student invites an individual onto campus knowing the individual will engage in speech falling within the definition of "[h]ostile environment sexual harassment," the student has engaged in prohibited conduct subject to enforcement under the policy.

39. The Board of Regents Sexual Harassment Policy directs the University to "adopt procedures on each campus for investigating and resolving complaints of prohibited conduct." The policy directs that the University adopt procedures "in coordination with . . . the director of the Office of Equal Opportunity and Affirmative Action."

40. The director of the Office of Equal Opportunity and Title IX, the office within the University with a title closest to that referenced by the Board of Regents Sexual Harassment Policy, is Defendant Tina Marisam.

11

41. On information and belief, then, Defendant Marisam is charged with enforcement of the Board of Regents Sexual Harassment Policy at least in the investigation and resolution of complaints of prohibited conduct, including potential referral to a University Authority for a hearing and the selection of a sanction or punishment upon a finding of guilt.

42. The Office of Equal Opportunity and Title IX is a unit office within the Office for Equity and Diversity. Defendant Mercedes Ramirez Fernandez is the Vice President, Office for Equity and Diversity.

43. On information and belief, then, Defendant Fernandez is charged with enforcement of the Board of Regents Sexual Harassment Policy at least in the investigation and resolution of complaints of prohibited conduct, including potential referral to a University Authority for a hearing and the selection of a sanction or punishment upon a finding of guilt.

44. The Board of Regents Sexual Harassment Policy directs the University to "address violations of this policy through disciplinary or other responsive action up to and including . . . academic dismissal."

45. The Board of Regents Sexual Harassment Policy directs Defendant Rebecca Cunningham, or her delegate, to "address complaints of prohibited conduct consistent with this policy and law and remedy any practice that deviates from this policy."

46. On information and belief, because the Board of Regents Sexual Harassment Policy targets and restricts speech about gender identity and transgender issues that others claim creates a hostile or offensive work or educational environment or "unreasonably

12

interferes with an individual's employment or educational performance," it targets and restricts speech consistent with the views of members of YAF currently enrolled at University schools, including but not limited to the University of Minnesota-Twin Cities and the University of Minnesota-Duluth.

47.     A student or guest who expresses his views contrary to the Board of Regents Sexual Harassment Policy faces the possibility of (a) having a sexual harassment complaint filed against him; (b) being contacted by University staff; (c) being subject to informal problem-solving processes; (d) having to defend himself at a hearing; and (e) facing an adverse adjudication and being punished.

48.     On information and belief, the Board of Regents Sexual Harassment Policy does not apply and has not been applied to prohibit speech *supporting* beliefs about human sexuality consistent with transgenderism or genderfluidity, including speech contending that (a) a person can choose to belong to multiple genders at a time, (b) a man can become a woman, (c) a man can give birth, (d) a man identifying as a woman should be permitted to access a woman's restroom or locker room, (e) a man can give birth, or (f) a man identifying as a woman should be permitted to compete in women's sports.

**University Administrative Policy:**
**Sexual Harassment, Sexual Assault, Stalking and Relationship Violence**

49.     In January 2018, the University adopted an administrative policy entitled "Sexual Harassment, Sexual Assault, Stalking and Relationship Violence" (Administrative Sexual Harassment Policy). The University last amended this policy in November 2025.

50.    The University adopted the Administrative Sexual Harassment Policy to implement the Board of Regents Sexual Harassment Policy.

51.    The University also adopted the Administrative Sexual Harassment Policy "to implement its commitment to" (a) "taking prompt and equitable action to eliminate, prevent and address the effects of prohibited conduct"; (b) "fostering a trusting environment where prohibited conduct is not tolerated"; (c) "cultivating a climate where all persons are well-informed and supported with respect to reporting prohibited conduct"; and (d) "identifying the standard by which violations of this policy will be evaluated and disciplinary action may be imposed."

52.    Like the Board of Regents Sexual Harassment Policy, the Administrative Sexual Harassment Policy prohibits "hostile environment sexual harassment." It defines "[h]ostile environment sexual harassment" to include "unwelcome conduct on the basis of . . . gender identity [or] gender expression" that "is severe, persistent or pervasive" and (a) "unreasonably interferes with an individual's employment or educational performance" or (b) "creates a work or educational environment that an individual finds, and a reasonable person would find, to be intimidating, hostile or offensive."

53.    The Administrative Sexual Harassment Policy defines "[c]onduct on the basis of sex" to include "conduct on the basis of . . . gender identity [and] gender expression."

54.    The Administrative Sexual Harassment Policy states that unwelcome conduct may be "verbal." Thus, the Policy reaches speech.

14

55. The Administrative Sexual Harassment Policy provides examples of sexual harassment. One example of speech that could constitute sexual harassment is "[a] pattern of disparaging comments or jokes about certain genders or based on gender stereotypes."

56. Because the Administrative Sexual Harassment Policy defines sex to include gender identity and punishes protected speech about gender identity or transgender issues that might offend or feel hostile to a hearer, or merely "unreasonably interfere[] with . . . employment or educational performance," the policy is unconstitutional.

57. The Administrative Sexual Harassment Policy applies across all University campuses.

58. The Administrative Sexual Harassment Policy applies to "University members." This term includes (a) "University students, whether enrolled full time or part time, for credit or non-credit courses" and (b) "third parties who are engaged in any University activity or program, or who are otherwise interacting with the University, including, but not limited to . . . guests."

59. As the Administrative Sexual Harassment Policy applies to "guests," it applies to individuals whom students invite to campus to speak to the University community.

60. The Administrative Sexual Harassment Policy regulates conduct, including "verbal" conduct (speech), by University members occurring both on and off campus. The policy reaches off campus where such conduct, including verbal conduct, "has a continuing adverse effect on a University education program or activity" or "creates a hostile

15

environment for one or more students, employees, or third parties while on University property or in any University employment or education program or activity."

61.    The Administrative Sexual Harassment Policy applies a subjective standard to determine whether a person has engaged in unwelcome conduct that rises to the level of "hostile environment sexual harassment." The policy states: "[t]he determination of whether conduct is unwelcome is made according to a subjective standard. In other words, the determination is made based on whether the complainant viewed the conduct as unwelcome."

62.    The Administrative Sexual Harassment Policy lists the Vice President, Office for Equity and Diversity as the "Responsible Officer." Defendant Mercedes Ramirez Fernandez serves in this position.

63.    On information and belief, then, Defendant Fernandez is charged with enforcement of the Administrative Sexual Harassment Policy at least in the investigation and resolution of complaints of prohibited conduct, including potential referral to a University Authority for a hearing and the selection of a sanction or punishment upon a finding of guilt.

64.    The Administrative Sexual Harassment Policy lists Defendant Tina Marisam, in her role as Associate Vice President, Office for Equity and Diversity, as the "Primary Contact."

65.    The Administrative Sexual Harassment Policy establishes a process for individuals to file complaints alleging "hostile environment sexual harassment" based on gender identity or gender expression.

16

66.     Under the Administrative Sexual Harassment Policy, an individual seeking to file a complaint alleging "hostile environment sexual harassment" may file a formal complaint, file an anonymous complaint, or initiate a request for informal problem-solving processes.

67.     A complainant submits a formal complaint to a Title IX Office.

68.     Defendant Tina Marisam, as Director of the Equal Opportunity & Title IX Office for the University of Minnesota-Twin Cities, oversees the office receiving both formal and anonymous complaints at the University of Minnesota-Twin Cities.

69.     On information and belief, then, Defendant Marisam is charged with enforcement of the Administrative Sexual Harassment Policy at least in the investigation and resolution of complaints of prohibited conduct, including potential referral to a University Authority for a hearing and the selection of a sanction or punishment upon a finding of guilt.

70.     Defendant Corey Christensen, as an Equal Opportunity Associate & Title IX Coordinator at the University of Minnesota-Duluth, oversees the office receiving both formal and anonymous complaints at the University of Minnesota-Duluth.

71.     On information and belief, then, Defendant Christensen is charged with enforcement of the Administrative Sexual Harassment Policy at least in the investigation and resolution of complaints of prohibited conduct, including potential referral to a University Authority for a hearing and the selection of a sanction or punishment upon a finding of guilt.

72. A formal complaint requests initiation of the grievance process. According to a University FAQ[6] page, "[t]he grievance process is the University's formal process for investigating and adjudicating reports of prohibited conduct."

73. If a Title IX office initiates an investigation, the subject of the investigation will (a) receive a written notice, (b) receive a request to be interviewed, and (c) have an opportunity to view and respond to evidence gathered by the Title IX office. The grievance process may proceed to a hearing conducted by a University Authority. After the hearing, the University Authority will make a determination on responsibility and can impose "disciplinary sanctions."

74. The Board of Regents Student Conduct Code sets the range of available disciplinary sanctions. Possible disciplinary sanctions include an oral or written warning, probation, restriction of privileges, suspension, expulsion, and the withholding or revocation of a degree.

75. The University's UReport system is available to a complainant wishing to file an anonymous complaint. Campus Title IX offices also receive anonymous complaints.

76. Under the Administrative Sexual Harassment Policy, a Title IX office "will address anonymous reports to the extent possible given the information provided in the report." A Title IX office may initiate informal problem-solving with the accused based on an anonymous complaint.

---

[6] The FAQ page for the grievance process is located at https://perma.cc/J4ER-7TZY.

77.     Where a Title IX office initiates informal problem-solving processes, the Title IX office may (a) "gather[] additional information about the alleged prohibited conduct to determine how to most effectively respond to the alleged prohibited conduct or to provide relevant information to the individuals involved"; (b) "notify[] a respondent about the concerns raised, and about any reported impact of the concerns on a complainant or community"; (c) "provid[e] education or coaching to a respondent or complainant"; (d) "provid[e] recommendations that are aimed at preventing further concerns from arising to an appropriate individual who oversees a respondent or complainant"; and (e) "establish[] a plan to monitor future misconduct."

78.     Accordingly, informal problem-solving processes under the Administrative Sexual Harassment Policy place burdens and obligations on individuals accused of sexual harassment, including those accused through anonymous reports.

79.     Defendant Tina Marisam, in her role as Director of Title IX & ADA Coordinator and Director of the Equal Opportunity & Title IX Office for the University of Minnesota-Twin Cities, oversees informal problem-solving processes at the University of Minnesota-Twin Cities.

80.     On information and belief, then, Defendant Marisam is charged with enforcement related to the informal problem-solving process vis-à-vis accused individuals.

81.     Defendant Corey Christensen, as an Equal Opportunity Associate & Title IX Coordinator oversees informal problem-solving processes at the University of Minnesota-Duluth.

19

82. On information and belief, then, Defendant Christensen is charged with enforcement related to the informal problem-solving process vis-à-vis accused individuals.

83. On information and belief, because the Administrative Sexual Harassment Policy targets and restricts speech about gender identity and transgender issues that others claim creates a hostile or offensive work or educational environment or unreasonably interferes with their employment or educational performance, the policy targets and restricts speech consistent with the viewpoints of YAF members currently enrolled at University schools, including but not limited to the University of Minnesota-Twin Cities and University of Minnesota-Duluth, as well as other University schools.

84. An individual who expresses those viewpoints faces the possibility of (a) having a sexual harassment complaint filed against him; (b) being contacted by someone from their University Title IX office; (c) being subject to informal problem-solving processes; (d) having to defend himself at a hearing; and (e) facing an adverse adjudication and being punished.

85. On information and belief, the Administrative Sexual Harassment Policy does not apply and has not been applied to prohibit speech *supporting* beliefs about human sexuality consistent with transgenderism or genderfluidity, including speech contending that (a) a person can choose to belong to multiple genders at a time, (b) a man can become a woman, (c) a man can give birth, (d) a man identifying as a woman should be permitted to access a woman's restroom or locker room, (e) a man can give birth, or (f) a man identifying as a woman should be permitted to compete in women's sports.

20

**University Administrative Policy:**
**Equity and Access: Gender Identity, Gender Expression, Names and Pronouns**

86.     In December 2019, the University adopted an administrative policy entitled "Equity and Access: Gender Identity, Gender Expression, Names and Pronouns" (Pronoun Policy). The University last amended this policy in February 2024.

87.     The University adopted the Pronoun Policy to implement the Board of Regents' Diversity, Equity, Inclusion, and Equal Opportunity Policy.

88.     The University enacted the Pronoun Policy in part to ensure "equal . . . opportunity to individuals of all gender identities and gender expressions" and to "promote[] a respectful University community free from discrimination based on gender identity or expression."

89.     The Pronoun Policy states, in relevant part, "University members and units are expected to use the names, gender identities, and pronouns specified to them by other University members."

90.     The Pronoun Policy further states, in relevant part, "University members and units are also expected to use other gendered personal references, if any, that are consistent with the gender identities and pronouns specified by University members."

91.     These portions of the Pronoun Policy only target speech and expression.

92.     These portions of the Pronoun Policy direct what a person may say when speaking to another person and about a third person who identifies as transgender, genderfluid, or non-binary.

21

93.     Because the use of pronouns and other gendered personal references in ordinary speech is ubiquitous, a person cannot avoid, or cannot be reasonably expected to avoid, using pronouns or other gendered personal references in speech.

94.     The Pronoun Policy adopts and advances the viewpoint that an individual can choose a gender inconsistent with the individual's sex and that an individual can choose to belong to more than one gender at a given time.

95.     The Pronoun Policy rejects the viewpoint that an individual's biological sex determines their gender, and a person cannot change their gender or be more than one gender at a given time.

96.     Because the above-quoted portions of the Pronoun Policy require a person to speak contrary to his deeply held beliefs and dictates the viewpoint he may express, it is unconstitutional.

97.     The Pronoun Policy applies across all University campuses.

98.     The Pronoun Policy applies to all University members, including students and guests.

99.     The Pronoun Policy defines gender identity as:

An individual's own understanding of themselves in terms of gendered categories that may include female, male, transgender, genderqueer, genderfluid, gender nonconforming, Two Spirit, intersex, non-binary, agender, genderless, and many others. Gender identity cannot be reliably determined by looking at an individual. An individual's gender identity may be consistent over their lifetime or may shift over time. Gender identity differs from sexual orientation, which refers to an individual's patterns of romantic and/or sexual attraction.

22

100.    The Pronoun Policy defines "gendered personal references" as references that "can include but are not limited to pronouns (e.g., he/him/his, she/hers/her, they/their/them), titles (e.g., Mrs., Ms., Mr., Mx.), and other terms denoting a person's gender identity."

101.    Under the Pronoun Policy, if a professor, teaching assistant, or fellow classmate tells a student that the individual's "preferred" pronouns or gender identity do not correspond with the individual's biological pronouns or sex, the student violates the Policy by intentionally or repeatedly using a biological pronoun or other gendered personal reference to refer to the individual. The same is true in the case of a guest using a biological pronoun or other gendered personal reference to refer to the individual.

102.    Under the Pronoun Policy, if a situation requires the use of a pronoun or other gendered personal reference and a professor, teaching assistant, or fellow classmate has told a student that the individual's "preferred" pronouns do not correspond to the individual's biological pronouns, the student must use the individual's "preferred" pronouns or other gendered personal references. Otherwise, the student violates the policy. The same is true in the case of a guest having to use the individual's "preferred" pronouns or other gendered personal references where a situation requires the use of such.

103.    The Pronoun Policy lists the Vice President, Office for Equity and Diversity as the "Responsible Officer." Defendant Mercedes Ramirez Fernandez serves in this position.

23

104.    On information and belief, then, Defendant Fernandez is charged with enforcement of the Pronoun Policy at least in the investigation and resolution of complaints.

105.    The Pronoun Policy lists Defendant Tina Marisam, in her role as Associate Vice President, Office for Equity and Diversity, as the "Primary Contact." The Pronoun Policy also identifies Defendant Marisam as the contact at the University of Minnesota-Twin Cities.

106.    On information and belief, then, Defendant Marisam is charged with enforcement of the Policy at least in the investigation and resolution of complaints.

107.    The Pronoun Policy identifies Defendant Corey Christensen as the contact at the University of Minnesota-Duluth.

108.    On information and belief, then, Defendant Christensen is charged with enforcement of the Pronoun Policy at least in the investigation and resolution of complaints.

109.    The Pronoun Policy contains a link to a FAQ page.[7]

110.    The FAQ page instructs that:

Using the chosen names, pronouns and other gendered references of others conveys a basic level of respect for them and their identities. Some individuals do not identify their gender within the binary system assumed by many languages. For example, not every individual identifies as a man or a woman or uses pronouns like "he/him/his" or "she/her/hers." There are numerous other pronouns that an individual may use, such as they/them/theirs or fae/faer/faers. Some individuals use more than one set of

---

[7] The FAQ page is attached as Exhibit D to this Complaint and is also available at: https://perma.cc/7EPL-Z92J

24

pronouns – such as she, they or he, they . . . . Regardless of how someone identifies, it is important to acknowledge, respect and refer to them by their chosen name and pronouns.

111.    The FAQ page specifically addresses the use of pronouns and other gendered personal references in foreign language class. The FAQ advises that the Pronoun Policy applies within the context of foreign language classes. The FAQ states that individuals in foreign language classes "may opt to use gender expansive pronouns, such as **elle** and **elles**. Language departments should ensure that instructors provide students with available non-binary structures in the language being learned so that students can communicate their gender identification in that language."

112.    By requiring language departments to provide a structure for students to communicate their "preferred" pronouns and gender identities, the Pronoun Policy and associated FAQ page necessarily place other students in those language classes on notice that they must use a transgender, genderfluid, or non-binary individual's "preferred" pronouns, gender identities, and other gender personal references as part of classroom instruction or course work.

113.    The FAQ page states that a student's or guest's use of a biological pronoun or other gendered personal reference rather than a "preferred" pronoun or other gendered personal reference "could, depending on the circumstances, constitute discrimination or harassment based on gender identity or gender expression in violation of Administrative Policy: Student Conduct Code."

114.    The FAQ page then states, "[v]iolations may occur when conduct based on gender identity or expression: (1) is unwelcome; (2) is severe, persistent, or pervasive; and

25

(3) unreasonably interferes with an individual's employment or educational performance [or] creates a work or educational environment that the individual finds, and that a reasonable person would find, to be intimidating, hostile, or offensive."

115. In addition to citing the Student Conduct Code, the FAQ page indicates that a student's or guest's use of a biological pronoun or other gendered personal reference rather than a "preferred" pronoun or other gendered personal reference may violate the University's Administrative Policy entitled "Discrimination," discussed *infra* at Paragraphs 120–154.

116. The FAQ page directs that "intentional or repeated misuse of pronouns should be reported."

117. The FAQ page places a reporting requirement on certain University employees.

118. The FAQ page contains a section entitled "I am concerned that I am being repeatedly misgendered? How do I report this concern?" In response to these questions, the section states that "[c]oncerns about being repeatedly misgendered can be reported to the campus Equal Opportunity Office, or reported to the central Equal Opportunity & Title IX Office."

119. This section also advises that the "Gender and Sexuality Center for Queer and Trans Life (GSC) can provide support to individuals who have been misgendered, and can also support individuals through the reporting process." It then provides an email address for the Gender and Sexuality Center for Queer and Trans Life.

**University Administrative Policy:**
**Discrimination**

120.    The FAQ page linked on the Pronoun Policy indicates that a student's "misgendering" of a transgender, genderfluid, or non-binary individual may violate the University's administrative policy on discrimination.

121.    In February 2022, the University adopted an administrative policy entitled "Discrimination."

122.    The Discrimination Policy implements the Board of Regents Diversity, Equity, Inclusion, and Equal Opportunity Policy.

123.    The University adopted the Discrimination Policy in part to (a) "tak[e] prompt and equitable action to eliminate, prevent, and address the effects of prohibited conduct"; (b) "foster[] an environment of trust where prohibited conduct is not tolerated"; (c) "cultivat[e] a climate where all persons are well-informed and supported with respect to reporting prohibited conduct"; and (d) "articulat[e] the standards and procedures by which violations of this policy will be evaluated and disciplinary action may be imposed."

124.    The Discrimination Policy applies across all University campuses.

125.    The Discrimination Policy applies to all University members. The Policy defines University member to include "students, whether enrolled full time or part time, for credit or non-credit courses" and "third parties who are engaged in any University activity or program, or who are otherwise interacting with the University, including, but not limited to . . . guests."

27

126. Because the Discrimination Policy applies to "guests," it applies to individuals whom students invite onto campus to speak to the University community.

127. The Discrimination Policy states that "[a]ll University members are prohibited from engaging in, or assisting or abetting another's engagement in, discrimination . . . ."

128. The Board of Regents Student Conduct Code, discussed at greater length *infra* at Paragraphs 155–167, defines "assists or abets" as when a student "(a) helps any other person engage in prohibited behaviors as defined by the *Student Conduct Code*; and (b) intends the prohibited behavior to occur or knows that their actions are significantly likely to help the other person to engage in the prohibited behavior."

129. On information and belief, this definition applies to the Discrimination Policy.

130. As a result of the "assisting or abetting" provision in the Discrimination Policy, if a University student invites an individual onto campus knowing the individual will engage in speech falling within the definition of "discriminatory harassment," the student has engaged in prohibited conduct subject to enforcement under the policy.

131. The Discrimination Policy regulates conduct by University members occurring both on and off campus. The Policy regulates conduct occurring off campus if it "has a continuing adverse effect on a University education program or activity" or "creates a hostile environment for students, employees, or third parties while on University property or in any University employment or education program or activity."

28

132. The Discrimination Policy lists gender identity and gender expression as protected characteristics.

133. The Discrimination Policy defines "prohibited conduct" and "discrimination" to include "discriminatory harassment." In turn, the Policy defines "discriminatory harassment" to include "[w]hen unwelcome conduct based on a protected characteristic is severe, persistent, or pervasive" and (a) "unreasonably interferes with an individual's employment, education, or participation in a University program or activity" or (b) "creates a work, employment, or other University environment that a reasonable person would find to be intimidating, hostile, or offensive."

134. The Discrimination Policy states that verbal conduct—i.e., speech—can amount to unwelcome conduct.

135. The Discrimination Policy states that "[i]n determining whether conduct is unwelcome, consideration is given both to the complainant's subjective experience and to whether a reasonable person would have perceived the complainant as welcoming the conduct."

136. Accordingly, predominantly subjective considerations may support a finding of discrimination.

137. The Discrimination Policy states that "a pattern of behavior" can amount to discrimination.

138. The Discrimination Policy provides examples of unwelcome conduct constituting discrimination, including:

29

(a) "conduct that . . . belittles, demeans, or undermines an individual or group because of a protected characteristic";

(b) "conduct that communicates that people with a certain protected characteristic do not belong in the community"; and

(c) "conduct that . . . treat[s] an individual or group differently because they conform or do not conform with what is perceived to be a stereotypical representation of a protected characteristic."

139. The Discrimination Policy states that "[a]llegations of discriminatory harassment based on . . . gender identity [and] gender expression . . . will typically be addressed pursuant to the Administrative policy entitled *Sexual Harassment, Sexual Assault, Stalking and Relationship Violence*." But the Discrimination Policy leaves open the possibility of its application to allegations of "discriminatory harassment" based on gender identity and gender expression where "the allegations would not constitute sexual harassment under the *Sexual Harassment, Sexual Assault, Stalking and Relationship Violence* policy even if substantiated."

140. The Discrimination Policy further states "[a]llegations of actions that adversely affect a term or condition of an individual's employment or education based on . . . gender identity [and] gender expression . . . will be considered under this policy."

141. On information and belief, therefore, the Discrimination Policy, and its definition of "discriminatory harassment," reach speech based on gender identity or gender expression.

142. Because the Discrimination Policy defines sex to include gender identity and punishes protected speech about gender identity or transgender issues that might offend or feel hostile to a hearer, or merely "unreasonably interfere[] with . . . employment,

30

education, or participation in a University program or activity," the policy is unconstitutional.

143. Because the Discrimination Policy defines sex to include gender identity and punishes protected speech about gender identity or transgender issues because it "undermines" an individual based on the individual's subjective view of that speech, the Policy is unconstitutional.

144. The Discrimination Policy lists Defendant Tina Marisam as the "Primary Contact."

145. Complainants may report discrimination by a student at the University of Minnesota-Twin Cities to the Office for Community Standards.

146. Defendant Lauren Adamski is the Director of the Office for Community Standards at the University of Minnesota-Twin Cities.

147. On information and belief, then, Defendant Adamski is charged with enforcement of the Discrimination Policy, at least in the investigation and resolution of complaints.

148. Complainants may report discrimination by a student at the University of Minnesota-Duluth to the Office of Student Conduct & Conflict Resolution.

149. Defendant Chris Kaberline is the Director of the Office of Student Conduct & Conflict Resolution at the University of Minnesota-Duluth.

150. On information and belief, then, Defendant Kaberline is charged with enforcement of the Discrimination Policy, at least in the investigation and resolution of complaints.

151.   On information and belief, the Discrimination Policy is or could be applied to investigate and punish members of YAF currently enrolled at University schools, including University of Minnesota-Twin Cities and University of Minnesota-Duluth, for using a biological pronoun or other gendered personal reference to refer to an individual who identifies as transgender, genderfluid, or non-binary.

152.   On information and belief, because the Discrimination Policy targets and restricts speech about gender identity and transgender issues that others claim create a hostile or offensive work or University environment or unreasonably interferes with their employment, education, or participation in a University program or activity, the policy targets and restricts speech consistent with the viewpoints of YAF members currently enrolled at University schools, including but not limited to the University of Minnesota-Twin Cities and University of Minnesota-Duluth, as well as other University schools.

153.   An individual who expresses those viewpoints faces the possibility of (a) having a discriminatory harassment complaint filed against him; (b) being contacted by someone from a University office tasked with enforcing the policy; (c) being subject to informal problem-solving processes; (d) having to defend himself at a hearing; and (e) facing an adverse adjudication and being punished.

154.   On information and belief, the Discrimination Policy does not apply and has not been applied to prohibit speech *supporting* transgenderism or genderfluid or non-binary individuals' beliefs about human sexuality, including speech contending that (a) a person can choose to belong to multiple genders at a time, (b) a man can become a woman, (c) a man can give birth, (d) a man identifying as a woman should be permitted to access a

32

woman's restroom or locker room, (e) a man can give birth; or (f) a man identifying as a woman should be permitted to compete in women's sports.

## Board of Regents' Student Conduct Code

155. The Board of Regents adopted a Student Conduct Code in July 1970. The Board of Regents last amended the Student Conduct Code on June 10, 2022.

156. The Student Conduct Code applies to all students enrolled in the University.

157. The Student Conduct Code conveys "behavioral expectations."

158. The Student Conduct Code seeks to "establish and nurture an environment for faculty, staff, students, and visitors that actively acknowledges and values equity and diversity."

159. The Student Conduct Code identifies "prohibited behaviors."

160. One prohibited behavior is a "Violation of University Rules." The Student Conduct Codes defines this as "engaging in conduct that violates University, collegiate, or departmental regulations that have been posted or publicized."

161. The above discussed policies in Paragraphs 26–154—(a) the Board of Regents Sexual Harassment Policy; (b) the Administrative Sexual Harassment Policy; (c) the Pronoun Policy; and (d) the Discrimination Policy—are posted and publicized policies.

162. Accordingly, a student who violates any of those policies also violates the Student Conduct Code.

33

163. A second prohibited conduct under the Student Conduct Code is "Discriminatory Harassment." The Student Conduct Code defines this term in accord with the definition of "discriminatory harassment" in the Discrimination Policy.

164. A third prohibited conduct under the Student Conduct Code is prohibited behavior under the Board of Regents Sexual Harassment Policy.

165. The Student Conduct Code proscribes a range of punishments for violations. They include an oral or written warning or reprimand, probation, required compliance, restriction of privileges, suspension, expulsions, and withholding or revocation of a degree.

166. The Student Conduct Code also authorizes informal problem-solving processes in lieu of a formal grievance process.

167. The Student Conduct Code directs Defendant Rebecca Cunningham, or her delegate, to "implement this policy, including publishing and distributing the *Student Conduct Code* and the procedures governing the student conduct process at the University."

**University Administrative Policy:**
**Resolving Alleged Student Conduct Code Violations**

168. The University adopted an administrative policy entitled "Resolving Alleged Student Conduct Code Violations" (Resolving Alleged Violations Policy) to implement the Board of Regents' Student Conduct Code.

169. The Resolving Alleged Violations Policy establishes general principles for the hearing and disciplinary process for adjudicating alleged violations of the Board of Regents' Student Conduct Code.

34

170. The Resolving Alleged Violations Policy lists the Vice President for Student Affairs as the "Responsible Officer." Defendant Calvin D. Phillips serves in this position.

171. On information and belief, then, Defendant Phillips is charged with investigating and resolving complaints of prohibited conduct pursuant to the Student Conduct Code, proposing punishments for violations, and overseeing informal resolutions.

172. The Resolving Alleged Violations Policy identifies Defendant Lauren Adamski as the campus contact for the University of Minnesota-Twin Cities.

173. On information and belief, then, Defendant Adamski is charged with investigating and resolving complaints of prohibited conduct pursuant to the Student Conduct Code, proposing punishments for violations, and overseeing informal resolutions.

174. The Resolving Alleged Violations Policy identifies Defendant Chris Kaberline, in her role as Director of Student Conduct and Conflict Resolution, as the campus contact for the University of Minnesota-Duluth.

175. On information and belief, then, Defendant Kaberline is charged with investigating and resolving complaints of prohibited conduct pursuant to the Student Conduct Code, proposing punishments for violations, and overseeing informal resolutions.

176. The Resolving Alleged Violations Policy directs each campus to "develop and maintain fair processes for resolving complaints against students." It further directs each campus to administer hearings and outcomes for violations of the Board of Regents' Student Conduct Code.

35

**University of Minnesota-Twin Cities Bias Response and Referral Network**

177.    In addition to receiving complaints directly through its Title IX Offices, Office of Student Conduct & Conflict Resolution, and Office for Community Standards, the University of Minnesota-Twin Cities has a Bias Response and Referral Network (BRRN).

178.    The BRRN receives reports of "bias incidents." The BRRN "responds to all reporters with written information about supportive resources and refers reports to the appropriate office that can effectively respond through" means including "investigation."

179.    The BRRN works in conjunction with the Equal Opportunity & Title IX Office and the Office for Student Affairs. The BRRN is staffed by representatives from those two offices.

180.    In fiscal year 2024, the BRRN received ten reports alleging bias based on gender, gender identity, or gender expression.

181.    In fiscal year 2025, the BRRN received nine reports alleging bias based on gender, gender identity, or gender expression.

182.    On information and belief, between 2024 and 2026, the BRRN received three reports alleging bias by a University member because the member complained about having to use the phrase "lactating individuals" instead of "mother."

183.    On information and belief, between 2024 and 2026, a University employee filed a report with the BRRN alleging that symbols or words on a fellow University member's hat amounted to bias based on gender identity.

36

184.    On information and belief, between 2024 and 2026, a University student filed a report with the BRRN alleging they were the victim of biased language based on gender expression.

185.    On information and belief, between 2024 and 2026, the BRRN received a complaint from a University student about a person saying "remember, only male and female."

186.    On information and belief, between 2024 and 2026, the BRRN received multiple reports complaining about comments made about gay marriage.

187.    Accordingly, in addition to the formal processes for reporting violations of the Administrative Sexual Harassment Policy, the Pronoun Policy, the Discrimination Policy, and the Student Conduct Code, students expressing views on gender identity and transgender issues in accord with those listed in Paragraphs 192 and 194 or students using biological pronouns face the threat of having a report filed against them with the BRRN. In turn, that report may be forwarded to a Title IX office or an office overseeing Student Conduct Code violations for investigation and further action by Defendants.

## **Young America's Foundation Members**

188.    Members of YAF are currently enrolled at the University of Minnesota-Duluth, the University of Minnesota-Morris, the University of Minnesota-Rochester, and the University of Minnesota-Twin Cities.

189.    These members are injured in their own right by the challenged policies, as detailed herein.

190. It is essential to the purpose of YAF that its members can speak freely to advance their viewpoints on gender identity and transgender issues and invite speakers to campus to express consistent beliefs.

191. Enjoining the challenged policies will inure to the benefit of YAF members because it will allow them to speak and invite guests to speak without fear of reprisal from Defendants.

192. Members of YAF currently enrolled at University schools, including University of Minnesota-Twin Cities and University of Minnesota-Duluth, hold the following beliefs on gender identity and transgender issues:

    a. Sex and gender are inextricably intertwined.

    b. Sex is determined at conception or at birth by biology and/or by God.

    c. Sex is immutable.

    d. A man cannot become a woman, and a woman cannot become a man.

    e. A person cannot change his or her sex or gender and cannot have multiple genders.

    f. Saying that a person can change his or her gender implies that God made a mistake.

    g. Only a person's biological sex, not gender identity, should determine a person's ability to use sex-separated facilities such as restrooms and locker rooms. Biological men who identify as women should not be permitted to use sex-separated spaces designed for women. And biological women who identify as men should not be permitted to use sex-separated spaces designed for men.

    h. Women deserve private spaces on campus. Forcing a woman to share a restroom or locker room with a biological male who identifies as female would make a woman feel uncomfortable and presents a safety concern.

38

    i. Only a person's biological sex, not gender identity, should determine a person's ability to play on sex-separated sport teams and compete in sex-separated individual sports.

    j. Allowing a person to use sex-separated facilities and play sex-separated sports based on gender identity rather than biological sex has a suppressive effect on and subordinates the views of individuals who believe sex is immutable.

193. Members of YAF currently enrolled at University schools, including University of Minnesota-Twin Cities and University of Minnesota-Duluth, aim to bring speakers to their campuses to talk about gender identity and transgender issues, advocate for viewpoints in accord with those identified in Paragraphs 192 and 194, and speak about detransitioning.

194. Members of YAF currently enrolled at University schools, including University of Minnesota-Twin Cities and University of Minnesota-Duluth hold the following beliefs about pronoun and other gendered references usage:

    a. Using a pronoun that corresponds with a person's biological sex (biological pronouns) versus using the "preferred" pronouns of a person who identifies as transgender, gender fluid, or nonbinary, conveys a message about whether sex and gender are immutable and whether a person can change his or her gender.

    b. When a speaker is forced to use a person's "preferred" pronouns that differ from the person's biological pronouns, the speaker is forced to endorse the idea that a person can change his or her sex/gender or belong to multiple genders at one time.

    c. The use of "preferred" pronouns is contrary to Catholic teaching.

    d. Being required to provide one's own "preferred" pronouns forces an individual to endorse the idea that a person can change his or her sex/gender or belong to multiple genders at a time.

39

195. Members of YAF currently enrolled at University schools, including University of Minnesota-Twin Cities and University of Minnesota-Duluth, believe they should only use biological pronouns and other gendered personal references consistent with their views that sex and gender are immutable.

196. Members of YAF currently enrolled at University schools, including University of Minnesota-Twin Cities and University of Minnesota-Duluth, are aware of numerous individuals in their university communities who identify as transgender, genderfluid, or non-binary.

197. Members of YAF currently enrolled at University schools, including University of Minnesota-Twin Cities and University of Minnesota-Duluth, have regular interactions with individuals in their university communities who identify as transgender, genderfluid, or non-binary. These interactions occur both in and out of the classroom.

198. Members of YAF currently enrolled at University schools, including University of Minnesota-Twin Cities and University of Minnesota-Duluth, have had classes taught by professors and teaching assistants who identify as transgender or non-binary.

199. Members of YAF currently enrolled at University schools, including University of Minnesota-Twin Cities and University of Minnesota-Duluth, are aware of individuals who identify as transgender, genderfluid, or non-binary using sex-separated restrooms and locker rooms on their campuses based on gender identity rather than biological sex.

200. Members of YAF currently enrolled at University schools, including University of Minnesota-Twin Cities and University of Minnesota-Duluth, are aware of active LGBTQ+ organizations on their campuses. These organizations regularly engage in tabling and flyering activities. These organizations generally advance the message, on a regular basis, that an individual can change his or her gender. These organizations have spoken in support of the proposition that the University and government should accommodate people who identify as transgender to the fullest extent based on their gender identity.

201. Members of YAF currently enrolled at University schools, including University of Minnesota-Twin Cities and University of Minnesota-Duluth, are aware of the University's efforts to create an "affirming climate" for individuals who identify as transgender, genderfluid, or non-binary. The University accomplishes this in part through the University of Minnesota-Twin Cities' Office of Equity and Diversity's Gender and Sexuality Center for Queer and Trans Life and the University of Minnesota-Duluth's Office of Diversity and Inclusion's Sexuality and Gender Equity Initiatives. The University also accomplishes this through the policies it adopts and enforces, including the policies challenged here.

202. Members of YAF currently enrolled at University schools, including University of Minnesota-Twin Cities and University of Minnesota-Duluth, are aware of and are subject to the Board of Regents and University of Minnesota Administrative policies discussed in Paragraphs 26–167.

203. Members of YAF currently enrolled at University schools, including University of Minnesota-Twin Cities and University of Minnesota-Duluth, have read the policies discussed in Paragraphs 26–167. They have done so to ensure their compliance with the policies to avoid being charged with harassment, discrimination, or a Student Conduct Code violation, and to avoid being the target of an investigation and facing punishment under the policies.

204. Having read the policies in Paragraphs 26–167, members of YAF currently enrolled at University schools, including University of Minnesota-Twin Cities and University of Minnesota-Duluth, have restrained themselves from expressing their beliefs on gender identity and transgender issues consistent with the beliefs in Paragraphs 192 and 194. They have censored their own speech. They will continue to do so as long as the policies remain in force. They have self-censored and will continue to self-censor to avoid any academic issues or risk being subject to investigation or punishment under the policies. They fear that individuals who identify as transgender, genderfluid, or non-binary or who consider themselves allies of such individuals will file a charge of harassment or discrimination or allege a violation of the Student Conduct Code if the YAF members express their beliefs openly. They fear prosecution under the challenged policies.

205. But for the policies in Paragraphs 26–167, members of YAF currently enrolled at University schools, including University of Minnesota-Twin Cities and University of Minnesota-Duluth, would more widely express beliefs on gender identity and transgender issues consistent with their beliefs in Paragraphs 192 and 194.

42

206.    Having read the policies in Paragraphs 26–167, members of YAF currently enrolled at University schools, including University of Minnesota-Twin Cities and University of Minnesota-Duluth, have refrained from bringing speakers to campus who would discuss gender identity and transgender issues, including detransitioning, and advocate for views consistent with the beliefs described in Paragraphs 192 and 194. Members of YAF fear prosecution under the challenged policies.

207.    But for the policies in Paragraphs 26–167, members of YAF currently enrolled at University schools, including University of Minnesota-Twin Cities and University of Minnesota-Duluth, would actively work toward bringing speakers to campus to discuss gender identity and transgender issues, including detransitioning, and advocate for views consistent with the beliefs described in Paragraphs 192 and 194.

208.    Members of YAF currently enrolled at University schools, including University of Minnesota-Twin Cities and University of Minnesota-Duluth, have been forced to use "preferred" pronouns to identify individuals within the university setting who identify as transgender, genderfluid, or nonbinary. This has occurred in and outside of the classroom setting. Within the classroom setting, members have been forced to use "preferred" pronouns to refer to professors, teaching assistants, and classmates. Members have been forced to use "preferred" pronouns both in classes taught in English and in foreign language classes. Members have felt forced to use "preferred" pronouns because of the policies discussed in Paragraphs 86–167. They fear prosecution under the challenged policies.

43

209. When not in a situation requiring the use of pronouns, members of YAF currently enrolled at University schools, including University of Minnesota-Twin Cities and University of Minnesota-Duluth, have avoided the use of pronouns rather than use an individual's "preferred" pronouns. They have avoided using pronouns and other gendered personal references in these situations to avoid violating the policies discussed in Paragraphs 86–167. They fear prosecution under the challenged policies.

210. But for the policies in Paragraphs 86–167, members of YAF currently enrolled at University schools, including University of Minnesota-Twin Cities and University of Minnesota-Duluth, would freely and exclusively use biological pronouns when referencing individuals who identify as transgender, genderfluid, or non-binary.

211. Members of YAF currently enrolled at University schools, including University of Minnesota-Twin Cities and University of Minnesota-Duluth, have also been forced to provide their own "preferred" pronouns in the classroom setting, on official and unofficial University forms, and as part of a graded class exercise. They have complied because they fear prosecution under the challenged policies.

## CLAIMS FOR RELIEF

### COUNT I
**Violation of First and Fourteenth Amendments**
**(Sexual Harassment Policies and Discrimination Policy are Void for Vagueness)**

212. Plaintiff YAF realleges each of its prior allegations in this complaint.

213. Plaintiff YAF brings Count I against all Defendants.

214. The First and Fourteenth Amendments prohibit unconstitutionally vague restrictions on speech. *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("It is a

basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."). This requirement furthers two purposes: (1) to provide fair notice to the citizenry of what is outlawed and (2) to provide standards for enforcement to officials.

215. A restriction is unconstitutionally vague if it "forbids . . . the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. Gen Constr. Co.*, 269 U.S. 385, 391 (1925).

216. Vague policies raise due process concerns because they force individuals to guess at their meaning. *Grayned*, 408 U.S. at 108–09. As a result of this vagueness, individuals "steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked." *Id.* at 109 (quotation marks omitted).

217. "[C]onstitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights." *Laird v. Tatum*, 408 U.S. 1, 11 (1972) (citing *Baird v. State Bar of Ariz.*, 401 U.S. 1 (1971); *Keyishian*, 385 U.S. 589; *Lamont v. Postmaster Gen.*, 381 U.S. 301 (1965); *Baggett v. Bullitt*, 377 U.S. 360 (1964)).

218. If a restriction "interferes with the right of free speech," then a stringent test for vagueness applies. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982); *see also Scull v. Va. ex rel. Comm. on Law Reform & Racial Activities*, 359 U.S. 344, 353 (1959) ("Certainty is all the more essential when vagueness might induce individuals to forego their rights of speech, press, and association for fear of violating an unclear law.").

219. The "hostile environment sexual harassment" provisions of the Board of Regents Sexual Harassment Policy and of the Administrative Sexual Harassment Policy lack precise definitions, detail, context, and notice to students about what speech about gender identity and transgender issues constitute sexual harassment or "hostile environment sexual harassment." These provisions of these policies fail to deliver adequate notice to a student of reasonable intelligence and permit for arbitrary enforcement. They are, therefore, unconstitutional.

220. The Board of Regents Sexual Harassment Policy and the Administrative Sexual Harassment Policy define "hostile environment sexual harassment" and adopt standards within that definition that courts have held to be unconstitutionally vague. *See, e.g.*, *Tennessee*, 762 F. Supp. 3d at 624–25; *Arkansas*, 742 F. Supp. 3d at 945; *Kansas*, 739 F. Supp. 3d at 926–28.

221. The "discriminatory harassment" provision of the Discrimination Policy lacks precise definitions, detail, context, and notice to students about what speech about gender identity and transgender issues constitutes discrimination or "discriminatory harassment." This provision of the Discrimination Policy fails to deliver adequate notice to a student of reasonable intelligence and permits for arbitrary enforcement. It is, therefore, unconstitutional.

222. The Discrimination Policy defines "discriminatory harassment" and adopts standards within that definition that courts have held to be unconstitutionally vague. *See, e.g.*, *Tennessee*, 762 F. Supp. 3d at 624–25; *Arkansas*, 742 F. Supp. 3d at 945; *Kansas*, 739 F. Supp. 3d at 926–28.

46

223. As a violation of the Board of Regents Sexual Harassment Policy, the Administrative Sexual Harassment Policy, or the Discrimination Policy is also a violation of the Student Conduct Code, the Student Conduct Code is also unconstitutional to the extent that it imports and punishes violations of those three policies.

224. Members of YAF fear investigation and punishment under these policies for engaging in discussions regarding gender identity and transgender issues. *Cf. Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022) ("[F]ear of the investigative process is sufficient to create an 'objective chill' that gives rise to standing." (citing *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330–35 (5th Cir. 2020)). For this reason, these members have self-censored their speech.

225. The existence and enforcement of the "hostile environment sexual harassment" provision of the Board of Regents Sexual Harassment Policy and the Administrative Sexual Harassment Policy and the "discriminatory harassment" provision of the Discrimination Policy violate the First and Fourteenth Amendment's protection against vagueness.

## COUNT II
### Violation of First and Fourteenth Amendments
### (Sexual Harassment Policies and Discrimination Policy are Viewpoint Discriminatory)

226. Plaintiff YAF realleges each of its prior allegations in this complaint.

227. Plaintiff YAF brings Count II against all Defendants.

228. The "hostile environment sexual harassment" provisions of the Board of Regents Sexual Harassment Policy and the Administrative Sexual Harassment Policy

include viewpoint-based restrictions on speech which violate the First Amendment rights of members of Plaintiff YAF.

229. The "discriminatory harassment" provision of the Discrimination Policy includes viewpoint-based restrictions on speech which violate the First Amendment rights of members of Plaintiff YAF.

230. "Discrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995).

231. This is true even if the messages the government targets are offensive to some; government action "disfavoring 'ideas that offend' discriminates based on viewpoint, in violation of the First Amendment." *Iancu v. Brunetti*, 588 U.S. 388, 396 (2019) (quoting *Matal v. Tam*, 582 U.S. 218, 223 (2017)). "If there is a bedrock principle underlying the First Amendment, it is that government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118 (1991) (quoting *United States v. Eichman*, 496 U.S. 310, 319 (1990)). Indeed, "[g]iving offense is a viewpoint." *Matal*, 582 U.S. at 243. Speech cannot be restricted where "the speech is merely offensive to some listener." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 217 (3d Cir. 2001) (Alito, J., authoring).

232. Despite this, the Board of Regents Sexual Harassment Policy and the Administrative Sexual Harassment Policy define "hostile environment sexual harassment" to include verbal conduct—speech—about gender identity or expression that

48

"unreasonably interferes with an individual's employment or educational performance" or "creates a work or educational environment that an individual finds, and a reasonable person would find, to be intimidating, hostile or offensive."

233. Likewise, the Discrimination Policy defines "discriminatory harassment" to include verbal conduct—speech—about gender identity or expression that "unreasonably interferes with an individual's employment, education, or participation in a University program or activity" or "creates a work, employment, or other University environment that a reasonable person would find to be intimidating, hostile, or offensive."

234. On one hand, the Board of Regents Sexual Harassment Policy, the Administrative Sexual Harassment Policy, and the Discrimination Policy permit University students and guests to advocate *for* propositions such as (a) a person can subscribe to multiple genders at a time, (b) a man can become a woman, (c) a man can give birth, (d) a man identifying as a woman should be permitted to access a woman's restroom or locker room, or (e) a man identifying as a woman should be permitted to play on a woman's sports team or in a division of sports competition dedicated for women, without any threat of investigation or punishment.

235. On the other hand, these same policies threaten University students, including members of Plaintiff YAF, as well as University guests, with investigation and punishment for advancing the opposite viewpoints, including those also listed in Paragraphs 192 and 194.

236. Because of this, the Board of Regents Sexual Harassment Policy, the Administrative Sexual Harassment Policy, and the Discrimination Policy discriminate

49

based on viewpoint. Thus, these policies are per se unconstitutional. *Olentangy*, 158 F.4th at 756 (explaining that "a viewpoint-discrimination finding suffices—without more—to hold a government action unconstitutional" in contexts outside of the in-school setting (citing *Rosenberger*, 515 U.S. at 829–30)).

237.   Even so, under any balancing test, the Board of Regents Sexual Harassment Policy, the Administrative Sexual Harassment Policy, and the Discrimination Policy violate the First Amendment. Defendants cannot show that they have a compelling interest to justify restricting speech contrary to the University policies challenged here. Even if they did, Defendants cannot show that the restriction is narrowly tailored. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022) (if a government entity restricts speech "the focus then shifts to the defendant to show that its actions were nonetheless justified and tailored consistent with the demands of . . . case law").

238.   As a violation of the Board of Regents Sexual Harassment Policy, the Administrative Sexual Harassment Policy, and the Discrimination Policy is also a violation of the Student Conduct Code, the Student Conduct Code is also unconstitutional to the extent that it imports and punishes violations of these three policies.

239.   Members of Plaintiff YAF fear penalties for engaging in discussions regarding gender identity and transgender issues advancing their viewpoints. For this reason, these members have self-censored their speech.

240.   The existence and enforcement of the "hostile environment sexual harassment" provision of the Board of Regents Sexual Harassment Policy and the Administrative Sexual Harassment Policy and the "discriminatory harassment" provision

of the Discrimination Policy thus violate the First and Fourteenth Amendment's protection against viewpoint discrimination.

## COUNT III
### Violation of First and Fourteenth Amendments
### (Pronoun Policy is Viewpoint Discriminatory)

241.    Plaintiff YAF realleges each of its prior allegations in this complaint.

242.    Plaintiff YAF brings Count III against Defendants Mercedes Ramirez Fernandez, Tina Marisam, Corey Christensen, Calvin D. Phillips, Lauren Adamski, and Chris Kaberline.

243.    Pronouns convey a message about gender identity and transgender issues, including the ability or inability of an individual to change genders or ascribe to more than one gender at a time. *Olentangy*, 158 F.4th at 753; *Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021).

244.    The requirement in the Pronoun Policy that students and guests use "preferred" pronouns and other gendered personal references subjects speakers to a charge of discrimination or an allegation of a Student Conduct Code violation for intentionally or repeatedly using a biological pronoun or other gendered personal reference instead of a "preferred" pronoun or other gendered personal reference when referring to an individual who identifies as transgender, gender fluid, or non-binary.

245.    The Pronoun Policy imposes no threat of investigation or punishment for using a "preferred" pronoun, rather than a biological pronoun, in that very same situation.

246.    The Pronoun Policy, therefore, engages in viewpoint discrimination.

247.    As the Discrimination Policy and the Student Conduct Code enforce the Pronoun Policy's prohibition on the intentional or repeated use of a biological pronoun or other gendered personal reference when an individual has provided a contrary "preferred" pronoun, the Discrimination Policy and the Student Conduct Code also engage in viewpoint discrimination to the extent they import and punish violations of the Pronoun Policy.

248.    Members of Plaintiff YAF currently enrolled in University schools, including the University of Minnesota-Twin Cities and the University of Minnesota-Duluth, fear being reported for violating the Discrimination Policy and the Student Conduct Code. They further fear being the target of an investigation, having to defend themselves at a hearing, and facing punishment for violating the Pronoun Policy. As a result, they avoid using pronouns, or where pronoun use is not avoidable, they use "preferred" pronouns against their will.

249.    The existence and enforcement of the University's requirement that students, visitors, and guests use "preferred" pronouns and other gendered personal references violates the First and Fourteenth Amendment's protection against viewpoint discrimination.

**<u>COUNT IV</u>**
**Violation of First and Fourteenth Amendments**
**(Pronoun Policy Compels Speech)**

250.    Plaintiff YAF realleges each of its prior allegations in this complaint.

251.   Plaintiff YAF brings Count IV against Defendants Mercedes Ramirez Fernandez, Tina Marisam, Corey Christensen, Calvin D. Phillips, Lauren Adamski, and Chris Kaberline.

252.   The requirement in the Pronoun Policy that students and guests use "preferred" pronouns and other gendered personal references, in combination with the Discrimination Policy and the Student Conduct Code, compels members of Plaintiff YAF to use "preferred" pronouns in violation of the First Amendment.

253.   The Supreme Court has long recognized that "freedom of thought and expression 'includes both the right to speak freely and the right to refrain from speaking at all.'" *Harper & Row Publishers v. Nation Enters.*, 471 U.S. 539, 559 (1985) (quoting *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)).

254.   "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or *force citizens to confess by word or act their faith therein*." *Janus v. AFSCME, Council 31*, 585 U.S. 878, 892 (2018) (quoting *W. Va. Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943)). "Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command, and in most contexts, any such effort would be universally condemned." *Id.*

255.   "When speech is compelled . . . additional damage is done. In that situation, individuals are coerced into betraying their convictions. Forcing free and independent individuals to endorse ideas they objectionable is always demeaning, and for this reason, one of our landmark free speech cases said that a law commanding 'involuntary

53

affirmation' of objected-to beliefs would require 'even more immediate and urgent grounds' than a law demanding silence." *Id.* at 893 (quoting *Barnette*, 319 U.S. at 633).

256. Pronouns convey a message about gender identity and transgender issues, including the ability or inability of an individual to change genders or subscribe to more than one gender at a time. *Olentangy*, 158 F.4th at 753; *Meriwether*, 992 F.3d at 508.

257. Students cannot avoid, or cannot be reasonably expected to avoid, the use of pronouns or other gendered personal references. In some situations, like a classroom exercise in a foreign language class, a student's refusal to use all pronouns will impact the student's academic achievement.

258. Requiring individuals to use preferred pronouns and other gendered personal references violates the protection against compelled speech afforded by the First Amendment. It "offers an illusory choice that is no choice at all—self-censor or acquiesce in the compelled speech." *Olentangy*, 158 F.4th at 791 (Bush, J., concurring).

259. Accordingly, the Pronoun Policy's requirement that students and guests use the "preferred" pronouns and other gendered personal references of an individual identifying as transgender, genderfluid, or non-binary at the threat of being reported, investigated, and punished under the Discrimination Policy or Student Conduct Code violates the First Amendment.

260. As the Discrimination Policy and Student Conduct Code enforce this provision of the Pronoun Policy, the Discrimination Policy and Student Conduct Code also violate the First Amendment.

261. The existence and enforcement of the University's requirement that students and guests use "preferred" pronouns and other gendered personal references violates the First and Fourteenth Amendment's protection against compelled speech.

### PRAYER FOR RELIEF AND DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff YAF respectfully requests the following relief:

A.  A declaration that the aspects of the policies challenged herein and discussed in Paragraphs 26–167 and their enforcement are unconstitutional;

B.  A permanent injunction prohibiting Defendants and their officers, agents, servants, employees, attorneys, and any other persons who are in active concert or participation with those individuals from enforcing the challenged aspects of the policies discussed in Paragraphs 26–167;

C.  Nominal damages of One Dollar ($1.00);

D.  Award Plaintiff YAF reasonable fees costs, expenses, and disbursements, including attorney's fees, associated with this litigation; and

E.  Grant Plaintiff YAF such additional and further relief as the Court may deem just and proper.

Respectfully submitted this 18th day of June, 2026.

/s/ *James V. F. Dickey*
James V. F. Dickey
    MN Bar No. 393613
Jordan R. Miller*
    Michigan Bar No. P81467
Southeastern Legal Foundation
560 W. Crossville Road, Suite 104
Roswell, GA 30075
Telephone: (770) 977-2131

jdickey@southeasternlegal.org
jmiller@southeasternlegal.org

* Pro hac vice motion forthcoming

56